[Cite as *State v. Lumbus*, 2016-Ohio-380.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 102273

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## BRIAN LUMBUS, JR.

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-11-556112-A

**BEFORE:**  Celebrezze, P.J., Kilbane, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**  February 4, 2016

**ATTORNEY FOR APPELLANT**

John B. Gibbons
55 Public Square
Suite 2100
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:    James D. May
Assistant Prosecuting Attorney
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

FRANK D. CELEBREZZE, JR., P.J.:

{¶1} Defendant-appellant, Brian Lumbus, Jr. ("Lumbus"), brings this appeal challenging his convictions in the trial court. Specifically, Lumbus argues that the trial court erred by (1) failing to suppress unlawfully obtained evidence and (2) permitting a police officer to offer expert opinions. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶2} A multi-agency investigation was launched after several bank customers complained that unauthorized or counterfeit checks had been drawn on their accounts. Bank investigators pursued internal leads and discovered that a bank call-center employee employed by Fifth Third Bank and U.S. Bank at the same time was conveying sensitive personal and financial information of bank customers to individuals in Cuyahoga County. Investigators determined that the recipients of the information wrote phony checks on customer accounts, opened "instant credit" accounts, and withdrew money from the accounts belonging to the victim-customers.

{¶3} On December 23, 2011, the Cuyahoga County Grand Jury charged Lumbus and 13 other defendants in a 222-count indictment. Relevant to the instant appeal, the Cuyahoga County Grand Jury charged Lumbus with Count 1 engaging in a pattern of corrupt activity, Count 2 conspiracy to engage in a pattern of corrupt activity, Count 3 conspiracy to engage in aggravated theft, Counts 4-5 aggravated theft, Counts 6-8 grand theft, Counts 22-34 identity fraud, Counts 54-59 identity fraud, Count 66 grand theft, Count 79 tampering with evidence, Count 105 attempted tampering with evidence, Count 106 obstructing justice, Counts 108-109 tampering with records, Count 127 identity fraud, Counts 137-138 identity fraud, and Count 222

possessing criminal tools with a forfeiture specification. Lumbus pled not guilty to the indictment.

**{¶4}** A jury trial commenced on February 26, 2014. On February 27, 2014, the trial court granted Lumbus's motion for a mistrial. The case was reassigned, and a second jury trial commenced on October 6, 2014.

**{¶5}** On October 1, 2014, the trial court held a hearing on Lumbus's motion to suppress (1) evidence discovered in his vehicle following a traffic stop and inventory search, and (2) evidence discovered in his grandmother's garage located at 7028 Roy Avenue in Cleveland, Ohio. The trial court determined that the traffic stop and the inventory search were lawful. Furthermore, although the trial court ruled that the search of the Roy Avenue garage was unlawful, the court ruled that Lumbus did not have standing to challenge the constitutionality of the search.

**{¶6}** Lumbus also moved to suppress evidence recovered when officers executed search warrants at 15678 Friend Avenue, in Maple Heights, Ohio, and 9501 Pratt Avenue, in Cleveland, Ohio. The trial court denied Lumbus's suppression motions.

**{¶7}** After resting its case, the state of Ohio dismissed Counts 6, 22, 24, 25, 30, 31, 79, 105, 108, 109, 127, 137, and 138. The trial court denied Lumbus's motion for a Rule 29(A) judgment of acquittal. Lumbus rested his case and the trial court denied his second motion for a Rule 29(A) judgment of acquittal.

**{¶8}** On October 30, 2014, the jury found Lumbus guilty of Counts 1, 2, 3, 4, 5, 7, 26, 27, 28, 29, 32, 34, 54, 55, 56, 57, 58, 59, 66, 106, and 222. The jury found Lumbus not guilty of Count 23. Furthermore, Count 33 was nolled.

**{¶9}** On November 5, 2014, the trial court held a sentencing hearing. The trial court

imposed the following sentence:   (1) ten years of imprisonment on Count 1; (2) nine months of imprisonment on Count 4, concurrent to Count 1; (3) nine months of imprisonment on Count 5, concurrent to Count 1; (4) nine months of imprisonment on Count 7, concurrent to Count 1; (5) nine months of imprisonment on Count 66, concurrent to Count 1; (6) nine months of imprisonment each on Counts 26, 27, 28, 29, 32, and 34, consecutive to each other and concurrent to Count 1; (7) six months of imprisonment each on Counts 54, 55, 56, 57, 58, and 59, with 55 concurrent to 56 and the remaining counts consecutive to each other and concurrent to Count 1; and (8) nine months of imprisonment on Count 222, concurrent to Count 1.   The trial court imposed five years of mandatory postrelease control.   Furthermore, the trial court imposed the following orders of restitution:   (1) $234,776 to U.S. Bank; (2) $110,000 to Fifth Third Bank; (3) $29,500 to First Merit Bank; and (4) $63,700 to National City Bank and/or PNC Bank.   The trial court credited Lumbus with 271 days of time served.

{¶10} Lumbus filed the instant appeal assigning four errors for review:

I.   The trial court erred and denied [Lumbus] his right to due process of law by failing to suppress evidence and prohibit the introduction of evidence obtained unlawfully in a traffic stop by the Westlake Police Department.

II.   The trial court erred and denied [Lumbus] his right to due process of law by failing to suppress and prohibit the introduction of evidence obtained unlawfully by the United States Secret Service and the Cuyahoga County Sheriff's Department in the search of Lumbus, vehicles associated with him and by the search of his grandmother's premises at 7028 Roy Avenue, Cleveland, Ohio 44104.

III.   The trial court erred and denied [Lumbus] his right to due process of law by failing to suppress evidence obtained through defective search warrants not supported by probable cause.

IV.   The trial court erred and denied Lumbus his right to due process of law by permitting an untrained and unqualified Bay Village patrol officer to offer expert opinions about his forensic analysis of the contents of various electronic storage devices.

## II. Law and Analysis

### A. Traffic Stop

{¶11} First, Lumbus challenges the constitutionality of the traffic stop, arguing that the officer's method of determining his speed was "suspect." Lumbus further disputes the legality of the traffic stop, arguing that the police never issued him a speeding citation.

{¶12} Appellate review of a suppression ruling involves mixed questions of law and fact. *See State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71. When ruling on a motion to suppress, the trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight of the evidence. *See State v. Mills*, 62 Ohio St.3d 357, 582 N.E.2d 972 (1992); *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). An appellate court must accept the trial court's findings of fact as true if they are supported by competent and credible evidence. *Burnside* at ¶ 8. The appellate court must then determine, without any deference to the trial court, whether the facts satisfy the applicable legal standard. *Id*.

{¶13} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee the right to be free from unreasonable searches and seizures. *State v. Orr*, 91 Ohio St.3d 389, 391, 745 N.E.2d 1036 (2001). The United States Supreme Court has held that a traffic stop is constitutionally valid if an officer has a reasonable and articulable suspicion that a motorist has committed, is committing, or is about to commit a crime. *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

{¶14} The Fourth Amendment imposes a reasonableness standard upon the exercise of discretion by government officials. *Delaware* at 653-654. Accordingly, "the permissibility of a particular law enforcement practice is judged by balancing its intrusion on the individual's

Fourth Amendment interests against its promotion of legitimate governmental interests." *Id*. at 654. To justify a particular intrusion, the officer must demonstrate "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

{¶15} In the instant matter, we find that the police officer had a reasonable and articulable suspicion that Lumbus was speeding, in violation of R.C. 4511.21. R.C. 4511.21(D)(5) provides "[n]o person shall operate a motor vehicle * * * [a]t a speed exceeding the posted speed limit upon a highway[.]"

{¶16} Officer Jeremiah Bullins of the Westlake Police Department testified during the trial court's suppression hearing. Officer Bullins testified that he was on routine patrol on November 14, 2010. Officer Bullins testified that he was driving westbound on Interstate 90 when he observed a white Yukon Denali traveling westbound. Officer Bullins testified "[a]s [the driver] was passing me I could see he was going at a high rate of speed. He was passing other vehicles." Officer Bullins testified that, in his opinion, the vehicle was operating in excess of the posted speed limit, a violation of R.C. 4511.21. Officer Bullins testified that he pulled behind the vehicle and paced the vehicle for approximately one mile from Clague Road to Columbia Road. Officer Bullins explained the method of pacing a vehicle to determine its speed:

> A pace is when you keep equal distance between both vehicles and using our speedometers you can tell how fast the vehicle in front of you is going as long as you keep the equal distance.
>
> I paced the vehicle at 72 miles per hour and I paced them from Clague Road to Columbia Road and initiated a traffic stop.

Furthermore, Officer Bullins explained that he did not, and could not, use his radar detector to determine the vehicle's speed because his patrol car was not stationary.

{¶17} Officer Bullins initiated a traffic stop near the Columbia Road exit. Officer Bullins testified that Lumbus was the registered owner of the vehicle that he stopped. Office Bullins informed Lumbus that he initiated the stop after pacing him at 72 miles per hour. Officer Bullins testified that "[Lumbus] told me he wasn't doing 72, he was only doing 70." Officer Bullins testified that the speed limit was 60 miles per hour.

{¶18} The trial court determined that there was probable cause for Officer Bullins to conduct a traffic stop based on the fact that Lumbus was speeding. Furthermore, the trial court explained:

> There was dispute as to how much [Lumbus] was going over the speed limit; defendant thought 70, the officers thought 72 based on the tracking, the pacing that he used to determine that, but in any event, whether it's 70 or 72, the speed limit was 60 and the officer said he would occasionally or has been known to not pull over people unless they're over 65, so all of these circumstances have determined to the Court at least that there is — there was a reasonable cause for the stop.

{¶19} Many Ohio courts, including this court, have found that pacing a car is an acceptable manner for determining speed. *State v. Horn*, 7th Dist. Belmont No. 04BE31, 2005-Ohio-2930, ¶ 18; *see Middleburg Hts. v. Campbell*, 8th Dist. Cuyahoga No. 87593, 2006-Ohio-6582, ¶ 17. In *State v. Woods*, 8th Dist. Cuyahoga No. 98054, 2012-Ohio-5509, ¶ 22, the state argued that the officer's traffic stop for speeding was warranted because the officer paced the defendant's vehicle. The trial court rejected this argument, finding that the officers only followed the defendant for two residential city blocks, and that this was "too short a distance to establish a speeding violation based on pacing." *Id*. at ¶ 23. In upholding the trial

court's ruling, this court held that the officers lacked probable cause to stop the defendant for speeding.  *Id*. at ¶ 24.

{¶20} After reviewing the record, we find that Officer Bullins had a reasonable and articulable suspicion that Lumbus was speeding based on (1) his observation of Lumbus's car traveling "at a high rate of speed" and "passing other vehicles," and (2) pacing Lumbus at 72 miles per hour.   Furthermore, unlike *Woods*, Officer Bullins paced Lumbus for approximately one mile — a sufficient distance to establish that he was driving over the speed limit.

{¶21} The fact that Officer Bullins did not cite Lumbus for speeding affects neither the legality of the traffic stop nor whether Officer Bullins had a reasonable suspicion that Lumbus was speeding.   Officer Bullins explained why he did not issue a speeding citation to Lumbus:

> [we] realized we had a larger fraud case going on, so if I was to issue a speed citation, it would be at River court, Rocky River Muni Court.   When I know that he's looking at tampering with records and forgery chargers, that convolutes — he's going to have two different court dates and it's just simpler just to focus on the bigger issue.

Furthermore, Officer Bullins testified:

> When we issue citations, that goes through the — our local municipal court at Rocky River.   This is a felony matter that would come down to the state court. When I would issue a citation that would kind of convolute — he would have to go to two different court appearances when it was — it was my decision just based off of we have a more serious crime.   Let's focus on that matter and not worry about a ten mile per hour speeding ticket.

Officer Bullins testified that he has the discretion to issue a warning, or to advise a driver to "slow it down," rather than issuing a citation for speeding.

{¶22} Lumbus contends that the police stopped him not because he was speeding, but because they were tracking him using a GPS tracking device, believed he was involved in criminal activity, and wanted to stop the vehicle.   There is no support for this argument in the

record.

{¶23} Westlake Police Officer Steve Krebs, who participated in the inventory search of Lumbus's vehicle, testified that he did not find any hidden or "aftermarket" GPS devices attached to the vehicle during the inventory search.

{¶24} Detective Jay Elish of the Bay Village Police Department testified that he had an open case on Lumbus at the time he was arrested in Westlake. Detective Elish testified that he received a phone call from the Westlake Police Department after officers saw his open case in the Law Enforcement Automated Data System ("LEADS") database. Detective Elish testified that he installed a GPS device on Lumbus's vehicle on November 16, 2010 at the Westlake Police Department, after Lumbus was stopped for speeding and arrested. Detective Elish testified that neither he nor the Secret Service installed a GPS on Lumbus's vehicle prior to November 16, 2010. Detective Elish testified that although the GPS device was successfully installed, it did not provide officers with any "noteworthy information" because the vehicle "was driven to [a repair shop] right after it was taken out of impound." Detective Elish testified that he removed the GPS device from Lumbus's vehicle one week after installing it while it was in the repair shop.

{¶25} Secret Service Special Agent Donald Heath testified that he was also involved in the Lumbus investigation. Agent Heath testified that he went to the Westlake Police Department with Detective Elish in November 2010. Agent Heath testified that the Secret Service was not tracking Lumbus's movements prior to November 16, 2010. Furthermore, Agent Heath testified that he was aware that Detective Elish placed a GPS tracking device on Lumbus's vehicle on November 16, 2010.

{¶26} The trial court held that there was no support for Lumbus's pretext argument:

There's no evidence of a pretext with regard to the investigation, nor was there any evidence that the Court found to suggest that a GPS device was on the defendant's car at [the time of the traffic stop]. There was evidence that [the GPS device was installed] later, but not at that time.

**{¶27}** As there is no evidence in the record that a GPS device was attached to Lumbus's vehicle at the time he was stopped for speeding on November 14, 2010, we find no merit to Lumbus's argument that Officer Bullins initiated the traffic stop based on evidence obtained from a GPS device, rather than his determination that Lumbus was speeding. Furthermore, even if Officer Bullins had some ulterior motive for stopping Lumbus, the stop would not be unconstitutional because he had a reasonable and articulable suspicion that Lumbus was speeding. "Where a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop, such as a suspicion that the violator was engaging in more nefarious criminal activity." *Dayton v. Erickson*, 76 Ohio St.3d 3, 665 N.E.2d 1091 (1996), syllabus.

**{¶28}** Accordingly, we find that Officer Bullins's traffic stop was constitutionally valid and that the trial court did not err in denying Lumbus's motion to suppress.

### B. Inventory Search

**{¶29}** Lumbus argues that the trial court erred in ruling that the inventory search of his vehicle was lawful. We disagree.

**{¶30}** When a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any

articulable facts giving rise to a suspicion of some illegal activity justifying an extension of the detention, the continued detention to conduct a search constitutes an illegal seizure. *State v. Robinette*, 73 Ohio St.3d 650, 653 N.E.2d 695 (1995), paragraph one of the syllabus.

**{¶31}** In the instant matter, Officer Bullins stopped Lumbus for speeding. However, during the traffic stop, officers established specific and articulable facts that warranted further investigation and detention of Lumbus.

**{¶32}** During the traffic stop, Lumbus provided Officer Bullins with an Ohio driver's license and proof of insurance. Officer Bullins testified that the computer in his patrol car was down, so he could not run the numbers from Lumbus's license plate and driver's license himself. Instead, Officer Bullins had to call the numbers in to dispatch over the radio so that dispatch could run them for him. Officer Bullins testified that dispatch informed him that the driver's license number on Lumbus's license belonged to another individual. Officer Bullins contacted dispatch on his cell phone to verify the information, in case there had been an issue with the radio communication. Dispatch verified that the Bureau of Motor Vehicles ("BMV") issued the driver's license number on Lumbus's license to another unrelated individual.

**{¶33}** Officer Bullins testified that Officer Krebs arrived at the scene of the traffic stop. Officer Krebs used his computer to run the driver's license number through the Ohio Law Enforcement Gateway "OLEG." Furthermore, after rebooting his own computer, Officer Bullins was able to run the driver's license number through the LEADS database. Officer Bullins testified that he was able to verify that the driver's license number did not belong to Lumbus. Officer Bullins testified that he always runs a person's driver's license number during a traffic stop — even if he is only giving the driver a warning — to determine if they have warrants, a criminal history, or a suspended license.

**{¶34}** Officer Bullins further testified that after inspecting Lumbus's driver's license, and comparing it to another Ohio driver's license, he determined that there were "distinct differences between these licenses." Officer Bullins testified about the specific differences between the licenses:

> The background in the State of Ohio is supposed to be a hologram. On Brian Lumbus' it was raised and was not a hologram. The back of the driver's license appeared to be fuzzy and copies where a typical driver's license is clear. There was a sticker, not like a driver's license but was printed directly onto the license.

**{¶35}** Officer Krebs testified that he was the second officer to arrive at the scene of the traffic stop. Officer Krebs testified that the driver's license that Officer Bullins was running "appeared to be fraudulent." Officer Krebs testified that he ran the driver's license number through OLEG, and that the OLEG picture did not match the picture on Lumbus's license.

**{¶36}** Based on the officers' review of Lumbus's license, and the differences they detected between Lumbus's license and another Ohio license, Officer Bullins determined that the license did not look like "an actual BMV issued license." Officer Bullins testified that although he stopped Lumbus for speeding, he believed the discrepancies in Lumbus's license warranted further investigation.

**{¶37}** The officers believed that they had probable cause to arrest Lumbus for fraud. Accordingly, Officer Bullins asked Lumbus to step out of the vehicle and placed him under arrest. There was one passenger in Lumbus's car at the time of his traffic stop and arrest. Officers did not arrest Lumbus's passenger. Officer Krebs testified that he gave the passenger a ride to a safe location.

**{¶38}** Officer Bullins testified that the officers impounded Lumbus's vehicle. Officer Bullins explained why the officers had Lumbus's vehicle towed:

We tow incident to arrest. The vehicle was registered to Mr. Lumbus, it was his property, so based off the arrest and fraudulent activity we would secure that vehicle and search incident to arrest.

Furthermore, Officer Bullins testified that the officers had the vehicle towed, rather than allowing the passenger to drive the vehicle, because the vehicle belonged to Lumbus.

{¶39} Officer Krebs testified that Lumbus's vehicle was impounded and towed back to the police station for inventory.

{¶40} During the inventory search of Lumbus's vehicle, officers found the following items: (1) a heat sealer, similar to a laminating machine, plugged into the vehicle's power source, (2) a VISA debit card and credit applications in the names of various, unrelated individuals, (3) financial and bank documents, (4) different electronic items and games, including a Playstation PSP, and (5) ID card stock blanks with magnetic strips. Detective Elish described the identification card blanks or ID card stock:

> There were two — we call them ID card stock. It's the square plastic card that driver's licenses are printed on an it was — it was blank. It just had a black magnetic strip on the back of it. So basically it was a blank ID card with a magnetic strip on the back.

{¶41} Automobile inventory searches are a well-defined exception to the warrant requirement of the Fourth Amendment. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). This exception permits officers to conduct an administrative inventory search of a vehicle after that vehicle has lawfully been taken into custody. *See State v. Mesa*, 87 Ohio St.3d 105, 108, 717 N.E.2d 329 (1999). Inventory searches are excluded from the warrant requirement because they are an administrative function of the police that protect an owner's property while it is in the custody of the police, ensure against claims of lost, stolen, or

vandalized property, and guard the police from danger. *Mesa* at 109. Police may conduct an inventory search of a vehicle that is being impounded. *State v. Peagler*, 76 Ohio St.3d 496, 501, 668 N.E.2d 489 (1996), citing *Colorado* at 372-373.

{¶42} One requirement of the inventory search exception is that it must be a reasonable search conducted without an investigatory intent. Whether the search is reasonable depends on if it is performed in good faith pursuant to standard police policy, and "the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded vehicle." *State v. Robinson*, 58 Ohio St.2d 478, 480, 391 N.E.2d 317 (1979). "Inventory searches 'must not be a ruse for a general rummaging in order to discover incriminating evidence.'" *State v. Burton*, 8th Dist. Cuyahoga No. 64710, 1994 Ohio App. LEXIS 1590 (Apr. 14, 1994), quoting *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990). "A search which is conducted with an investigatory intent, and which is not conducted in the manner of an inventory search, does not constitute an 'inventory search.'" *State v. Caponi*, 12 Ohio St.3d 302, 303, 466 N.E.2d 551 (1984).

{¶43} In *State v. Semenchuk*, 122 Ohio App.3d 30, 701 N.E.2d 19 (8th Dist.1997), this court held that "testimony to the effect that the officer was adhering to standard police procedures" is sufficient in demonstrating that the inventory search was lawful. *Id*. at 40.

{¶44} In the instant matter, Officer Bullins testified that Lumbus had pulled his vehicle to the left of the highway, on the "high speed side." Therefore, rather than searching the vehicle on the highway and risking officer safety, officers had the vehicle towed back to the Westlake police station, where they conducted an impound and inventory. Officer Bullins testified that the officers followed Westlake's policy for impounding Lumbus's vehicle under these circumstances.

{¶45} Officer Krebs testified that he follows the department's policy every time he conducts an inventory. Officer Krebs testified that although officers occasionally conduct inventory searches on the highway, they do avoid conducting vehicle inventories next to the high speed lane because it is safer to do the inventory at the police station. Officer Krebs testified that officers follow an inventory form while taking inventory of a vehicle. Officer Krebs explained that the inventory form has "certain boxes we check. For example, look at valuables in the vehicle, mark the valuables down on the inventory form before it's towed to the impound lot."

{¶46} After reviewing the record, we find that the officers conducted the inventory search of Lumbus's vehicle in good faith and in a reasonable manner. Furthermore, Lumbus has failed to present any evidence suggesting that the officer's inventory search was improper, not conducted in good faith, or not conducted pursuant to department policy. Thus, the trial court did not err in denying Lumbus's motion to suppress the evidence obtained from his vehicle.

{¶47} Lumbus's first assignment of error is overruled.

### B. Garage Search

{¶48} Lumbus argues that the trial court erred by failing to suppress the evidence obtained from his grandmother's garage, located at 7028 Roy Avenue, Cleveland, Ohio. Specifically, Lumbus argues that: (1) the officers surveilling the Roy Avenue house did not see anyone enter the house or the garage, and (2) there was no evidence that criminal activity was afoot or that the police would find contraband in the house or the garage.

{¶49} On October 30, 2011, officers — acting pursuant to a confidential informant's tip that Lumbus would be returning from Cincinnati, Ohio, with stolen merchandise — began to

surveil Lumbus around 9:00 p.m. as he entered Cuyahoga County on I-71 northbound in Strongsville. Detective Rick Williamson of the Cuyahoga County Sheriff's Office testified that the police were aware of the vehicles being used to transport the merchandise ahead of time. Officers were surveilling: (1) a black Cadillac and (2) a white U-Haul pick-up truck with a trailer attached to it. The officers observed the vehicles make three stops after entering Cuyahoga County. First, the vehicles stopped at an apartment building near East 30th Street and Community College Avenue in Cleveland. Second, the vehicles stopped at a gas station on Fleet Avenue in Slavic Village. During the second stop, the officers observed a silver vehicle pull up and meet with the person in the Cadillac. Detective Williamson testified, "I observed Mr. Lumbus open the trailer and give the contents of the trailer to at least two other individuals." Furthermore, Detective Williamson testified that officers observed "approximately ten, white, retangular boxes taken from the trunk of the black Cadillac and placed into the silver Chevrolet Impala." After observing this transaction, officers stopped the silver vehicle and recovered approximately ten brand-new and unopened Apple iPads from the vehicle's trunk. Officers seized the silver vehicle and placed the occupants under arrest.

{¶50} Third, shortly after midnight, the vehicles arrived at Lumbus's grandmother's house on Roy Avenue in Cleveland. Officers observed the Cadillac parked on the street and the white pick-up truck and trailer backed into the driveway. Detective Williamson testified that the trailer was approximately 10 to 15 feet from the garage. Detective Williamson testified "we were under the impression that the contents of the U-Haul trailer would be unloaded into the garage. Detective Williamson testified that one or two officers remained at the Roy Avenue location and continued to surveil the house while the rest of the officers met at a different location to discuss the situation and determine how they wanted to proceed.

{¶51} Detective Williamson testified that the officers returned to the Roy Avenue house after their strategic meeting. As officers approached the Roy Avenue house, the Cadillac accelerated toward the officers. Detective Williamson testified that the officers stopped the Cadillac and removed the driver, an African-American female. Detective Williamson testified that officers also detained Lumbus and another African-American male standing outside of the U-Haul truck in the driveway. Although the officers encountered these three individuals outside of the Roy Avenue house — which was consistent with the officers' observations during their surveillance of the Cadillac and U-Haul truck — Detective Williamson testified "we weren't sure if there were any other people that had left the vehicles and entered the home." Furthermore, Detective Williamson explained why the officers believed they needed to search the house and garage:

> Because of the way the truck was situated, we believed that because the truck was backed into the driveway, we could not observe the trailer from that vantage point. We were unaware of whether or not the trailer had been unloaded and the contents of the trailer either taken into the garage or into the home itself.

Detective Williamson further testified that the officers who continued to surveil the Roy Avenue house during the strategic meeting "were unable to see the rear of the home. They could only see the front of the home."

{¶52} Detective Williamson testified that approximately ten officers split up and approached the home from both the front and the rear. Detective Williamson testified that the officers making the initial entry in the front of the house were Secret Service agents. Officers entered the house at approximately 1:30 a.m. on October 31, 2011. Detective Williamson testified that his weapon was drawn when he approached the rear of the house, and that he re-holstered his weapon before entering the house. Detective Williamson testified that he did not see whether the officers at the front of the house had their weapons drawn, but he assumed

the officers did have their weapons drawn when they approached the house. Detective Williamson had a body camera on his bulletproof vest, and he testified that he turned the camera on when he entered the house. Detective Williamson's body camera did not show the officers' initial entry into the house and did not show the protective sweep of the house that the officers conducted. Detective Williamson's body camera did show him requesting verbal consent to search the garage, and also showed Lumbus's grandmother pushing the button to open the garage door.

{¶53} The officers conducted a protective sweep of the house before asking Lumbus's grandmother for consent to search the house. Detective Williamson testified that the entire house was searched for people prior to getting consent from Lumbus's grandmother. Detective Williamson testified that he told Lumbus's grandmother, "ma'am we're looking for people right now. We'll search for property later." Detective Williamson testified that officers neither had a search warrant to enter the house nor were there any exigent circumstances permitting the officers to enter the house.

{¶54} Detective Williamson testified that officers searched the Cadillac and the U-Haul outside of the Roy Avenue house. Detective Williamson testified "we were aware of what items were believed to be in the trailer and there were some items that were not in the trailer that we believed should have been, so we were unaware if those items had been unloaded prior to our arrival."

{¶55} Detective Williamson testified that he verbally asked Lumbus's grandmother for consent to search the garage. Detective Williamson testified, "I was informed by another agent at the time that [Lumbus's grandmother] had already completed that [consent] form." Detective Williamson testified that the agent did not have the consent form with him, but

verbally told him that Lumbus's grandmother had already signed the form. Detective Williamson testified that, pursuant to his training, he proceeded to get "further additional consent" after the agent informed him that Lumbus's grandmother had already signed the consent form. Detective Williamson testified that Lumbus's grandmother volunteered to take him around the house and show him her electronics. Furthermore, Detective Williamson testified that Lumbus's grandmother told the police that there was nothing stolen in the garage and then pushed the button to open the garage door. Detective Williamson testified that no one forced Lumbus's grandmother to push the button.

{¶56} Lumbus's grandmother, Delores Walton ("Walton"), testified that she resides at 7028 Roy Avenue in Cleveland, Ohio. Walton testified that she was home with her son on the evening on October 30, 2011. Walton testified that her son is 62 years old and has special needs. Walton testified that she woke up when she heard banging on her door. Walton testified that she ran downstairs and learned that it was the police knocking at the door. Walton testified that she opened the door and officers "rushed in." Walton testified that she did not invite the officers inside. Walton testified that "they came in with guns and they asked me was I Brian Lumbus's grandmother." Furthermore, Walton testified, "I opened up my door, the officer went running to my steps, and I said, You can't go up there." Walton testified that after the officers entered the house, they brought Lumbus inside.

{¶57} Walton testified that she "might have" given police permission to search her house because she was afraid. When defense counsel asked her if she gave the police permission to go into her garage, Walton testified:

The policeman told me, We must go in your garage, Walton.

And I said, For what?

He said, We have to go in there.

So I got up and pushed the button in the house and let the door up.

Furthermore, Walton testified that she told the officers who wanted to look in the garage to "go ahead" because she did not have anything in the garage to hide.

{¶58} Walton testified that the officers handed her a yellow piece of paper and told her to sign it. Walton testified that she did not know what kind of paper it was because she was so upset, and testified "I didn't know what I was really doing." Walton testified that she did not know what she was signing and that she did not read the form. Walton testified that she signed the paper because the officer told her to do so. Furthermore, Walton testified that she signed the form because she wanted the police to "hurry up, get out my house, and leave me be." Walton testified that the number of officers inside her house made her nervous. Walton testified that after officers were done rushing around and everything calmed down, she told the officers to go ahead and search because she had nothing to hide.

{¶59} Officers seized the following items from Walton's garage: (1) credit card account numbers, (2) National City credit applications in the names of 61 unrelated individuals, (3) software and manuals, (4) an iPod, (5) cables attached to a mini CD, (6) a solder, (7) a black pouch containing electronic equipment, (8) a USB device, (9) a keyboard, (10) Apple equipment, (11) 18 ATM plastic covers, (12) 10 Ohio hologram labels from the Ohio Department of Public Safety, (13) one Cuyahoga County Treasure document, (14) blank checks belonging to Lumbus, (15) an Apple desktop computer, (16) an iPad, (17) batteries, (18) a cell phone SIM card, (19) ammunition, (20) an ink stamp, (21) a printer and drive, (22) Walmart gift

cards, and (23) miscellaneous electronic equipment. Officers located these items in five different boxes in Walton's garage.

{¶60} The trial court ruled that the Secret Service agents did not lawfully obtain consent from Walton. The trial court found that the agents obtained Walton's signature on the consent form by duress or coercion. Furthermore, the trial court found that the verbal consent subsequently obtained by Detective Williamson did not cure the defect of the initial unlawful entry. However, the trial court denied Lumbus's motion to suppress the evidence obtained from the garage based on the fact that he did not have a reasonable expectation of privacy regarding the items seized from the garage, and thus lacked standing to challenge the officers' search. The trial court held that Lumbus failed to meet his burden of showing that he had a legitimate expectation of privacy.

{¶61} The trial court based its ruling on the following facts:

> The defendant, by the evidence, does not stay there, either on a permanent or temporary basis, has no furniture or goods or otherwise other than what was there. He has no connection to his grandmother except an occasional visit, as does the other grandchildren on a periodic basis. When he does come, he did not request, nor receive any consent to have the boxes stored there.

Furthermore, the trial court found that although Lumbus had a subjective expectation of privacy in the items found in the garage, the facts in this case do not support "a societal reasonable expectation of privacy[.]"

### 1. Consent

{¶62} First, Lumbus argues that the search of his grandmother's garage was unlawful because (1) police obtained consent to search the home and garage through coercion and the threat of physical force, and (2) the officers' conduct "was offensive and was designed to circumvent the constitutional necessity of obtaining a search warrant."

**{¶63}** Generally, a warrantless search conducted without probable cause violates the Fourth Amendment, unless there is consent to the search. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When seeking to rely on the consent exception of the warrant requirement, the state must show by "clear and positive" evidence that the consent was "freely and voluntarily" given. *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *see State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988). The United States Supreme Court has held that "whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." *Schneckloth* at 227.

**{¶64}** The only testimony regarding the officers' initial entry into the house was that of Walton.

**{¶65}** Regarding the initial entry into the house, Walton testified, "I opened up my door, the officer went running up to my steps, and I said, You can't go up there." Furthermore, Walton testified that she neither let the officers into her house nor invited them inside, and that the officers rushed in when she opened her front door. Walton testified that the officers' guns were out of their holsters when she opened the front door and they came rushing in. Walton testified "when I opened up my door, and they rushed in the way they did, I really was afraid."

**{¶66}** Regarding her verbal consent, Walton testified that after things calmed down, she told the officers to go ahead and search because she had nothing to hide.

**{¶67}** Regarding the consent to search form, Walton did not recall signing a consent form, but remembered signing a yellow piece of paper that the officers handed her and told her to sign. Walton testified that she neither knew what she was signing nor read the form before signing it. Walton testified that she signed the paper because the officer told her to do so.

Walton testified that the number of officers in and around her house caught the attention of her neighbors and that she was embarrassed. Walton testified that she signed the form because she wanted the police to "hurry up, get out my house, and leave me be." Walton testified that the number of officers inside her house made her nervous.

{¶68} After reviewing the record, we find that the state failed to demonstrate that Walton's consent was freely and voluntarily given. Taking the facts and testimony into consideration, we find that the officers obtained Walton's consent to search the house and garage through coercion or duress based on the totality of the circumstances. The officers did not explain Walton her rights when she opened the door, and we cannot say that Walton understood her rights under those circumstances. Furthermore, we find that Walton's verbal consent to search the garage — which was recorded by Detective Williamson's body camera — was not freely and voluntarily given, based on her testimony that (1) she felt nervous and intimidated by the number of officers in and around her house, (2) she was embarrassed and wanted the officers to leave her house as soon as possible, and (3) she was afraid and did not know what might happen if she did not allow them to go into her garage.

{¶69} Accordingly, we find that the trial court did not err in ruling that the officers' search of Walton's garage was unlawful.

## 2. Standing

{¶70} Second, Lumbus argues that the trial court "improperly ruled that [he] did not have standing to contest the search and seizure." Lumbus contends that the trial court "overlooked the central purpose of the Fourth Amendment which is deterrence of unlawful police conduct." We disagree.

**{¶71}** The United States Supreme Court has held that "[t]he touchstone of Fourth Amendment analysis is whether a person has a 'constitutionally protected reasonable expectation of privacy.'" *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), quoting *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

**{¶72}** Fourth Amendment rights are personal rights that cannot be asserted vicariously. *Rakas v. Illinois*, 439 U.S. 128, 133-134, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Thus, "[a] defendant bears the burden of proving not only that the search was illegal, but also that he had a legitimate expectation of privacy in the area searched." *State v. Dennis*, 79 Ohio St.3d 421, 426, 683 N.E.2d 1096 (1997); *see Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). A person meets this burden only by establishing (1) a manifested subjective expectation of privacy in the object of the challenged search, and (2) that society is prepared to recognize that expectation as legitimate. *Ciraolo* at 211.

**{¶73}** In *United States v. Payner*, 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), the United States Supreme Court explained that a defendant's Fourth Amendment rights are not violated unless the challenged police conduct invades *his* — rather than a third party's — legitimate expectation of privacy. *Id.* at 731; *see Rakas* at 143. The court addressed a court's supervisory power of suppressing evidence, despite a defendant's lack of standing, that is tainted by gross illegalities or deliberate intrusions into a person's privacy. *Payner* at 733. The court recognized that "the suppression of probative but tainted evidence exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *Id.* at 734; *Rakas* at 137-138. Furthermore, the court held:

> We conclude that the supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court. Our Fourth Amendment decisions have established beyond any doubt that the interest in deterring illegal searches does not justify the exclusion of tainted evidence at the instance of a party who was not the victim of the challenged practices. *Rakas v. Illinois*, supra, at 137; *Alderman v. United States*, 394 U.S., at 174-175. The values assigned to the competing interests do not change because a court has elected to analyze the question under the supervisory power instead of the Fourth Amendment. In either case, the need to deter the underlying conduct and the detrimental impact of excluding the evidence remain precisely the same.

*Id*. at 735-736.

{¶74} After reviewing the record, we find that Lumbus failed to meet his burden of proving that he had a legitimate expectation of privacy in Walton's garage. Walton testified that there were not any vehicles in her driveway when she went to bed, and that she had no knowledge about the U-Haul truck that was in her driveway when she woke up. Walton testified that she did not know that Lumbus was storing things in her garage. Walton testified that Lumbus did not ask her to put anything in her garage and that she never gave Lumbus permission to store anything in her garage. Walton testified that Lumbus did not live with her and that he would come over "from time to time" to check on her. Walton testified that Lumbus never stayed at her house overnight.

{¶75} Furthermore, we cannot say that the conduct of the officers was grossly illegal or deliberately intrusive, such that the evidence should be suppressed despite the fact that Lumbus lacks standing to challenge the search. While the officers did enter and secure the house without Walton's consent, they did request her consent before searching the garage.

{¶76} Accordingly, we find that the trial court did not err in finding that Lumbus lacked standing to challenge the search of Walton's garage.

{¶77} Lumbus's second assignment of error is overruled.

## C. Search Warrants

**{¶78}** Police officers executed search warrants at 15678 Friend Avenue, in Maple Heights, Ohio and 9501 Pratt Avenue, in Cleveland, Ohio. Lumbus argues that (1) there was insufficient probable cause in the affidavits upon which the search warrants were issued, and (2) it is unclear whether the search warrants were actually signed by the judges that issued the warrants.

**{¶79}** First, Lumbus contends that he has presented "substantial evidence that there was an insufficient probable cause showing in the affidavits." Second, Lumbus argues that the searches were unlawful based on R.C. 2933.23 and Crim.R. 41.

**{¶80}** R.C. 2933.23, affidavit for search warrant, provides, in relevant part:

> A search warrant shall not be issued *until there is filed with the judge or magistrate* an affidavit that particularly describes the place to be searched, names or describes the person to be searched, and names or describes the property to be searched for and seized.

(Emphasis added.)

**{¶81}** Lumbus argues that in order for the search to be valid, the search warrant must be filed with the clerk of court's office before the search takes place.

**{¶82}** In *State v. Sloan*, 17 Ohio Misc. 78, 242 N.E.2d 689 (Ohio C.P. 1968), the Montgomery County Court of Common Pleas addressed Lumbus's argument:

> The requirement is, "a warrant for search shall not be issued until there is filed with the judge or magistrate an affidavit * * *." So what is the specificity of the words "is filed" in conjunction with "the judge or magistrate." There is no requirement in the legislation under consideration that the affidavit be filed with the clerk of any court and that it be spread upon the dockets and journalized before the jurisdiction of the judge or magistrate is invoked. It is not uncommon that warrants for search are sought by officers from judges and magistrates who are in their homes at the particular time or some other place other than their respective courtroom or chamber. No duty is imposed upon the judge or magistrate to keep a file of the affidavits prepared for search warrants. In those cases where the officer presents a separate affidavit, I know of no cases where the

judge or magistrate retains the separate affidavit so presented. They are retained by the officer and if a return is made upon any search warrant issued, such affidavit is usually returned and all thereof may eventually become part of the file as respects an accused in question. So, this court holds that the words "is filed with the judge or magistrate an affidavit" means to make application: to file an affidavit for a search warrant.

*Id*. at 80.

{¶83} In *State v. Bates*, 6th Dist. Williams No. WM-12-002, 2013-Ohio-1270, _ 30, the Sixth District Court of Appeals interpreted the requirements of R.C. 2933.23: "[w]ith regard to an officer's application for a search warrant, R.C. 2933.23 and Crim.R. 41(_) require the officer to file an affidavit with the judge or magistrate that particularly describes the person, place, and property to be searched." *Id*.

{¶84} In the instant matter, regarding the Pratt Avenue search warrant, Detective Elish signed the affidavit on July 14, 2010, and presented the affidavit to Judge Timothy McCormick. Judge McCormick signed the search warrant on July 14, 2010. Police executed the search warrant on July 16, 2010. The search warrant was filed with the court on July 23, 2010.

{¶85} Regarding the Friend Avenue search warrant, Detective Elish signed the affidavit on December 9, 2010, and presented the affidavit to Judge Peter Corrigan. Judge Corrigan signed the search warrant on December 9, 2010. Police executed the search warrant on December 9, 2010. The search warrant was filed with the court on January 21, 2011.

{¶86} The trial court issued the following ruling on the defense's argument that a search is unlawful unless the search warrant is filed with the clerk of court before the search takes place:

The state has found two cases that interpret that statute. That, in essence, state delivery to the court — as I understand the cases, delivery to the court of the search warrant is sufficient for the purposes of filing with regard to that provision. And that the practice has been, and is to my knowledge, that the

search warrant is presented to the court for examination and review and execution, if proper, and that's been the practice since — for an extended period of time; and that's the practice used and examined in those two cases.

The court is going to deny the defense motion in that regard as well. There's no indication the practice was not followed in this situation. The defendant was challenging the term, What does "filed" mean, in the context of a search warrant.

{¶87} Third, Lumbus disputes the signatures on the search warrants. Cuyahoga County Common Pleas Judge Timothy McCormick signed the Pratt Avenue search warrant, and Cuyahoga County Common Pleas Judge Peter Corrigan signed the Friend Avenue search warrant.

{¶88} During the trial court's hearing on Lumbus's motion to suppress, Judge Corrigan testified regarding the normal search warrant procedure:

I am notified that someone would like me to review a search warrant and affidavit, sit down, review the affidavit and the warrant, and if there's probable cause contained in the search warrant then I sign it.

{¶89} Judge Corrigan further testified: "I'll swear to the affiant who is present whether or not this is true to the best of his knowledge and if he can swear that it is true then I would — and there is probable cause, I'll sign the warrant and I believe I signed the affidavit as well." Judge Corrigan confirmed that the signature on the second page of the Friend Avenue search warrant belonged to him.

{¶90} Judge McCormick testified that he signed the Pratt Avenue search warrant on July 14, 2010. Furthermore, during the trial court's hearing, defense counsel had Judges McCormick and Corrigan sign a blank piece of paper, and then compared those in-court signatures to the signatures on the search warrants. Defense counsel argued that the signature on the Pratt Avenue search warrant appeared to be "distinctly different" than Judge McCormick's in-court signature on the blank sheet of paper — despite Judge McCormick's

testimony that the signature on the warrant was his own. Defense counsel requested that a handwriting expert compare Judge McCormick's in-court signature to the signature on the search warrant. The trial court denied the defense's request and issued the following ruling regarding Lumbus's challenge to the search warrant signatures:

> With regard to Judge McCormick's signature issue, the Court is convinced that based on the testimony by the Judge himself after reviewing his own signature on the document presented to him and having executed in court an exemplary of his signature for comparison did state that both were his signatures.
>
> I have — contrary to defense counsel's argument or conclusion that the signatures are not significantly the same to raise the question, my review of those signatures is that they are sufficiently the same for the purposes of nonexperts looking at them. And, more importantly, the Judge testified that it was his signature in each case.
>
> And so I don't think an expert analysis is necessary or appropriate under these circumstances[.]

**{¶91}** After reviewing the record, we find that the trial court did not err in denying Lumbus's motion to suppress the evidence obtained when police executed the Pratt Avenue and Friend Avenue search warrants. Lumbus has failed to present any evidence to support his claim that there was a lack of probable cause upon which to issue the search warrants. Furthermore, Lumbus has failed to present any case law to support his argument that a search warrant executed before it is filed with the clerk of court is unlawful. The record also does not support Lumbus's contention that Judge McCormick did not sign the Pratt Avenue search warrant.

**{¶92}** Accordingly, Lumbus's third assignment of error is overruled.

### D. Officer Kime's Testimony

**{¶93}** Lumbus argues that Officer Russell Kime is unfit to testify as an expert witness and that the trial court erred by permitting him to offer expert opinions about his forensic analysis of electronic storage devices.

**{¶94}** Ohio Evid.R. 702, testimony by experts, provides:

A witness may testify as an expert if all of the following apply:

(A)   The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

(B)   The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(_)   The witness' testimony is based on reliable scientific, technical, or other specialized information.   To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

(1)   The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

(2)   The design of the procedure, test, or experiment reliably implements the theory;

(3)   The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.

*See Abrams v. Siegel*, 166 Ohio App.3d 230, 2006-Ohio-1728, 850 N.E.2d 99, ¶ 33 (8th Dist.).

**{¶95}** "The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court.   In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the part of the trial court."   *State v. Wages*, 87 Ohio App.3d 780, 786, 623 N.E.2d 193 (8th Dist.1993), citing *State v. Maupin*, 42 Ohio St.2d 473, 330 N.E.2d 708 (1975); *State v. Minor*, 47 Ohio App.3d 22, 546 N.E.2d 1343 (10th Dist.1988).   In order for the trial court's ruling to be found an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable.   *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶96}** First, regarding the ability to clarify a set of facts for the factfinder:

the expert must demonstrate some knowledge on the particular subject superior to that possessed by an ordinary juror. The qualification of an expert depends upon the expert's possession of special knowledge that he or she has acquired either by study of recognized authorities on the subject or by practical experience that he or she can impart to the jury which will assist the jury in understanding a pertinent matter.

*Azzano v. O'Malley-Clements*, 126 Ohio App.3d 368, 373, 710 N.E.2d 373 (8th Dist.1998).

{¶97} Second, the witness's specialized knowledge, skill, experience, training, or education must allow him to assist the trier of fact in understanding the facts of the case. Furthermore, "the expert witness is not required to be the *best witness* on the subject, but his or her testimony must assist the trier of fact in the search for the truth." *Azzano* at 374. (Emphasis added.)

{¶98} The third requirement is that the source of information the expert uses and the reliability of his method of reaching a conclusion yield reliable data.

{¶99} In the instant matter, the trial court determined that Officer Kime was an expert for the purposes of computer forensic examination:

> The Court's going to determine that this witness is an expert for the purposes of computer forensic examination based on the skill and training that he's had, and it seems to me that based on the software that he has, it's going to reveal what's there. There may be more there, but it will reveal what it reveals.
>
> Given your experience level and the number of times you've done this, the Court is going to determine that expert questions can be put to him or expert opinion be given by this police officer for the jury to determine the credibility based on the standard of evidence that I've given them at the beginning of the trial. We'll go forward on that basis.

{¶100} Officer Kime testified that he examined three devices in this case: (1) a two gigabyte "Staples-brand" thumb drive, (2) an eight gigabyte thumb drive, and (3) an HP laptop computer. Officer Kime testified that Detective Elish gave him parameters for his examination, and told him to look for "any type of picture IDs or pictures or anything to do with making

identification cards." Furthermore, Officer Kime testified that he was advised to search for any files related to a Zebra printer which had been used in this case.

{¶101} Officer Kime testified that he found several files that were relevant to the search parameters on the Staples thumb drive: "I found a number of identifications on there that had different pictures on it with the same names or same BMV numbers." Furthermore, Officer Kime testified that the findings from his examination of the eight gigabyte thumb drive were "[p]retty much the same. More picture IDs, different photos, back sides of the driver's license of Ohio. Mr. Lumbus's driver's license on there." Officer Kime testified that he examined the laptop and was able to determine that "a Zebra P30i printer was attached to this laptop."

{¶102} Officer Kime testified that he was not involved in the searches during which officers seized the devices that he examined. Furthermore, Officer Kime testified that he neither has personal knowledge of where the devices he examined came from nor knows to whom the devices belong.

{¶103} After reviewing the record, we cannot say that the trial court abused its discretion by determining that Officer Kime is an expert witness in the field of computer forensic examination.

{¶104} Regarding the first factor, Officer Kime testified in detail about: (1) the process of computer and memory storage, (2) recovering information off of a hard drive, (3) restoring deleted files, (4) "wiping" a hard drive and recovering files from a "wiped" hard drive, and (5) the difference between "deleting" files and "overwriting" files. Officer Kime explained that he has testified in court before regarding his skills as a computer forensic examiner, but that the court did not recognize him as an expert witness.

**{¶105}** Regarding the second factor, Officer Kime testified that he was a police officer in Raleigh, North Carolina for roughly six years before joining the Bay Village Police Department. Officer Kime testified that he has been a Bay Village police officer for 18 years. Officer Kime testified that he is a patrol officer and a computer forensic examiner. Officer Kime testified that he has been a computer forensic examiner for ten years. Officer Kime testified that he received certificates after going to a number of different schools.

**{¶106}** Officer Kime explained his training and schooling in the area of computer forensics:

> I use the Forensic Toolkit. It's called FTK. I went to FTK's — like a three day school for that. I use EnCase software which is from Guidance Software. I went to a week long school conducted by EnCase. I've gone to a couple the state offered through [Ohio Police Officer's Training Academy (OPOTA)], the different — some of the schools that's offered through there.

Furthermore, Office Kime testified that he has participated in OPOTA's continuing education training in the field of computer forensics.

**{¶107}** Officer Kime testified that he has the following computer forensics certificates: (1) certificate of completion for Guidance Software/EnCase (2006), (2) certificate of completion for access data bootcamp/FTK (2007), (3) basic data recovery analysis (2004), (4) basic ILook software school (2004), (5) Internet Investigations (2004), and (6) Internet Investigations #2 (2004). Officer Kime testified that his most recent computer forensic training was "a year or two" ago.

**{¶108}** Officer Kime testified that most of his computer forensic training focuses on "acquiring the information off a hard drive and examining that information, plain and simple." Officer Kime testified that he has examined "hundreds" of hard drives or other memory devices and over 50 laptop computers during his career. Officer Kime testified that he has not received

updated training for the software programs since 2007 due to the budget issues.

{¶109} Regarding the third factor, Officer Kime testified that the fact that he does not have the updated training has no effect on the accuracy of his findings. Officer Kime explained that without the appropriate software update, there are some files — roughly 10 percent — that he would not be able to access. Officer Kime testified that he would be able to recover roughly 90 percent of the files from a hard drive with the training and software he currently has, and that the 90 percent would be accurate. Furthermore, Officer Kime testified that he takes precautionary steps, and uses a "write blocker," to make sure that he does not alter or compromise the original files and information when he is making a copy to analyze.

{¶110} Based on Officer Kime's testimony, we find that the trial court's ruling permitting him to testify as an expert witness was neither unreasonable nor arbitrary. Although Lumbus argues that Officer Kime's training is "outdated," having the most current or updated training is not a prerequisite to testifying as an expert witness. The trial court reasonably concluded that (1) Officer Kime was qualified to testify as an expert witness on computer forensics, and (2) his testimony could assist the jury in understanding the facts of the case, including the evidence obtained from thumb drives and laptop computer.

{¶111} Accordingly, Lumbus's fourth assignment of error is overruled.

### III. Conclusion

{¶112} After reviewing the record, we find that the trial court did not err in failing to suppress evidence obtained from (1) Lumbus's vehicle, (2) Walton's garage, (3) the Friend Avenue house in Maple Heights, and (4) the Pratt Avenue house in Cleveland.

{¶113} First, Officer Bullins's traffic stop was lawful because he had a reasonable and articulable suspicion that Lumbus was speeding. Second, after arresting Lumbus based on the

discrepancies with his driver's license, officers lawfully impounded his vehicle and conducted an inventory search at the Westlake Police station. Third, although the officers' search of the Roy Avenue house and garage was unlawful, and conducted without valid consent from Walton, Lumbus failed to demonstrate that he had a legitimate expectation of privacy in the garage. Thus, Lumbus lacked standing to challenge the officers' search. Fourth, officers lawfully obtained evidence from the Friend Avenue and Pratt Avenue search warrants. Lumbus's argument that the search warrants were issued without probable cause is not supported by any evidence or testimony. We find no merit to Lumbus's argument that a search warrant that is executed by the police before it is filed with the clerk of courts is unlawful. Furthermore, based on the testimony of Judge Corrigan and Judge McCormick, Lumbus's contention regarding the validity of the signatures on the search warrants is entirely unsupported.

{¶114} Accordingly, we overrule Lumbus's first, second, and third assignments of error.

{¶115} We find that the trial court's recognition of Officer Kime as an expert witness in the field of computer forensic examination was not an abuse of discretion. The trial court's ruling was neither unreasonable nor arbitrary in light of Officer Kime's training, experience, and certifications. Furthermore, based on Officer Kime's testimony, the trial court reasonably concluded that he could assist the jury in understanding the facts of the case. Accordingly, we overrule Lumbus's fourth assignment of error.

{¶116} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed,

any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
FRANK D. CELEBREZZE, JR., PRESIDING JUDGE

MARY EILEEN KILBANE, J., and
SEAN C. GALLAGHER, J., CONCUR